# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JAKITA M.[1]                              )
                                          )
               **Plaintiff,**       )
                                          )
**vs.**                                   )   **Civil No. 3:20-cv-01269-GCS**
                                          )
**COMMISSIONER of SOCIAL**                )
**SECURITY,**                             )
                                          )
              **Defendant.**       )

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, through counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.[2]

### PROCEDURAL HISTORY

Plaintiff applied for DIB on January 19, 2018, alleging a disability onset of November 1, 2015. After holding an evidentiary hearing on February 13, 2020, an Administrative Law Judge ("ALJ") denied the application on March 6, 2020. On September 26, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 23). Plaintiff

---

[1]     Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]     This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 11).

exhausted administrative remedies and filed a timely complaint with this Court.

## ISSUE RAISED BY PLAINTIFF

Plaintiff raises the following issue:

1.      The ALJ must assess Plaintiff's allegations of disabling symptoms. In doing so, the ALJ must provide logical and clear reasons to support the conclusion. The issue is whether the ALJ provided good reasons to discredit Plaintiff's allegations.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows

an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that Plaintiff had a severe impairment of

fibromyalgia and found that Plaintiff also had the following non-severe impairments of obstructive sleep apnea, restless leg syndrome, obesity, and adjustment disorder.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR § 404.1567(b), except: she can never climb ropes, can occasionally climb ladders, scaffolds, ramps or stairs; can occasionally balance, stoop, kneel, crouch or crawl; can avoid ordinary workplace hazards, but should have no more than occasional exposure to hazards such as unprotected heights or dangerous, unguarded machinery. Further, based on the testimony of the Vocational Expert ("VE"), the ALJ found that Plaintiff could do past relevant work as an administrative assistant, coordinator of skills training, and public relations coordinator. (Tr. 36, 37). Thus, the ALJ found Plaintiff was not disabled.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum & Order. The following summary of the record is directed to the point raised by Plaintiff.

### 1.    Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing on February 13, 2020. (Tr. 23). During the hearing, Plaintiff and the VE, Brenda G. Young, testified.

Plaintiff testified that she suffered from a lot of pain, extremely sleepless nights, and fatigue. (Tr. 61). She stated that the pain was intense in her shoulders and elbows, which inhibited her ability to lift and turn. She was also experiencing pain in her hips. *Id*. She testified that sometimes her fibromyalgia was debilitating to the point that she could

barely get out of bed. On those days, her activities of daily living were limited; for example, she could not help her kids get ready for school or prepare meals for her family. Plaintiff also noted she had sleep apnea. (Tr. 64). She testified that the combination of her sleep apnea and fibromyalgia made her highly fatigued. (Tr. 65). She also took at least two naps a day, and sometimes the naps were an hour or more because of her fatigue.

Plaintiff further testified that she was depressed. (Tr. 66). She also noted that she felt useless and that she was not a good mother or wife. *Id*. She additionally indicated she had trouble focusing, which rendered her unable to pay the household bills or assist her children with their homework. (Tr. 67).

## 2.   Relevant Medical Records

### a.   West County Medical Associates

Plaintiff treated with West County Medical Associates at various times from April 2015 to March 2018. On April 24, 2015, Plaintiff went to West County Medical Associates for treatment of body aches. (Tr. 489). Plaintiff reported pain from a pedicure and manicure. *Id*. She also noted that her body aches were worse during travel and that hugging her children was unpleasant. *Id*. Plaintiff further indicated that she was having difficulty falling asleep, that she felt fatigued, and that she was mildly depressed. Michele Marcus, NP, noted that Plaintiff had tenderness with pressure applied to the scapular area, elbow and ankle, which were dipropionate to the stimulus. (Tr. 491). For her depression, NP Marcus referred Plaintiff to Dr. Jeffrey Farb, PsyD. However, Dr. Farb did not accept Plaintiff's insurance. (Tr. 758). NP Marcus switched Plaintiff's depression medication to Cymbalta. (Tr. 488).

On May 29, 2015, Plaintiff reported problems with sleep, extreme fatigue, snoring, unrefreshing sleep, and legs "jumping around" while sleeping. (Tr. 483). She also reported that Cymbalta had helped her muscle aches. *Id*. NP Marcus referred Plaintiff to pulmonologist Dr. Jeffrey Harris for her sleep issues.

On June 29, 2015, Plaintiff reported her body aches were worsening and noted that during a week in which it rained, she "could hardly move [because it] hurt so bad." (Tr. 479). NP Marcus prescribed Meloxicam, ordered two x-rays of the right hand, ordered lab work, and referred Plaintiff to rheumatologist Dr. Steven Lauter. *Id*. The right-hand x-ray revealed mild diffuse degenerative changes. (Tr. 499).

On September 28, 2015, Nurse Walls referred Plaintiff to cardiologist Dr. Davis Sewall. (Tr. 474).

On October 27, 2015, Plaintiff saw Nurse Walls for right-sided low-back pain, but the back pain had receded and had been replaced by sharp hip pain. Plaintiff reported that her pain was an 8 out of 10, that she had weakness in her right leg resulting from the hip pain, and that walking and certain movements aggravated the condition. This hip pain caused Plaintiff to remain in bed all day. Nurse Walls ordered a cortisone injection for trochanteric bursitis of the right hip and prescribed Methylprednisolone. (Tr. 471).

Thereafter on December 1, 2015, Plaintiff presented to West County Medical Associates for her hip pain. She also reported recent pain in her groin. Dr. James Corder, her primary care physician, noted that even with physical therapy, Plaintiff's hip pain was not being alleviated. Dr. Corder ordered x-rays of the right hip, which showed no visible abnormality. Dr. Corder found that Plaintiff had fibromyalgia and that it was

"fairly well controlled." (Tr. 468).

On March 14, 2016, Plaintiff reported worsening fibromyalgia symptoms and that she was constantly having flare ups. She also reported issues with energy, memory and concentration, which resulted in her receiving disciplinary action at work. She also stated that she had numbness in her hands and feet and that that she did not drive while her extremities were numb. The notes reflected that Plaintiff consulted with her psychologist who recommended taking time off and that her psychologist later encouraged her to return to work. The notes also reflected that when Plaintiff attempted to return to work, she experienced panic attacks that she could not tolerate. Thus, her employer advised her to apply for long-term unemployment. (Tr. 464).

Plaintiff met with Nurse Walls again on August 10, 2016. Nurse Walls noted that Plaintiff's fibromyalgia was "worse" and that Plaintiff stated the symptoms were more severe in the summer. She also stated that her joint pain was aching and constant. (Tr. 461-462). Nurse Walls further noted that Plaintiff's diagnosis of sleep apnea, restless leg syndrome, and narcolepsy were all stable. (Tr. 460).

On March 16, 2018, Plaintiff reported to Nurse Walls that she suffered from chronic pain, depression, anxiety, and exhaustion. (Tr. 758). She also reported that she spent many days in bed and that she felt hopeless, worthless, and guilty. (Tr. 764).

**b.      Dr. Jeffrey Harris**

Plaintiff initially treated with Dr. Harris on August 25, 2015 for her sleep issues. (Tr. 536). Dr. Harris found that she had "multiple sleep issues," including profound hypersomnia with an elevated Epworth at 19, a high likelihood of sleep apnea, and

restless legs. (Tr. 537). Dr. Harris prescribed Mirapex for her restless legs and recommended a sleep study to further investigate her sleep disorder. *Id*.

Plaintiff participated in the sleep study on November 8, 2015. The results showed that she had mild sleep apnea with an apnea-hypopnea index of 7.7, a REM index of 14, and a sleep-disoriented breathing index of 52 events an hour. (Tr. 554). Plaintiff received a recommendation for CPAP treatment. (Tr. 538, 554).

On January 11, 2016, Plaintiff saw Dr. Harris and presented with unresolved sleep problems. (Tr. 538). After the November sleep study, Plaintiff felt much more rested after she began using the CPAP. However, since then, she had remained significantly lethargic during the daytime. (Tr. 538).

Thereafter on August 16, 2016, Plaintiff met with Dr. Harris. Dr. Harris noted that Plaintiff had been using her CPAP consistently, reflecting a 97% use rate, but that Plaintiff still suffered from hypersomnia. (Tr. 540). Dr. Harris prescribed Nuvigil to address the issue.

On March 22, 2018, Plaintiff met with Dr. Harris for her sleep problems. (Tr. 581). Plaintiff reported she was suffering from fatigue, pain that disrupted her sleep, and restless legs that were not controlled. *Id*.

Next, Plaintiff met with Dr. Harris on March 21, 2019. Plaintiff reported cough, fatigue, and issues related to her sleep apnea and restless leg syndrome. She also reported that her depression had worsened. (Tr. 677). Thus, on March 26, 2019, Dr. Harris completed a medical source statement as to Plaintiff's physical functional capacity. (Tr. 609). Dr. Harris opined that Plaintiff was limited to sitting up to four hours per workday

and to standing up to four hours per workday. He also opined that Plaintiff could frequently lift items weighing less than ten pounds, but heavier items could rarely be lifted. (Tr. 610). Finally, Dr. Harris opined that Plaintiff would have approximately three bad days per month due to her impairments. (Tr. 611). In his medical source statement regarding her mental functioning, Dr. Harris opined that Plaintiff was mildly limited in all subcategories in the following areas: (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaption. (Tr. 616-617).

**c.     Dr. Steven Lauter**

Plaintiff treated with rheumatologist Dr. Steven Lauter, MD on several occasions. On August 27, 2015, Plaintiff saw Dr. Lauter. Plaintiff reported her pain was aching and dull and became aggravated by climbing stairs, lifting, and with movement. (Tr. 519). Based on her symptoms, Dr. Lauter suspected fibromyalgia. (Tr. 519). Dr. Lauter noted Plaintiff's symptoms were moderate to severe, occurred intermittently, and were worsening. Dr. Lauter ordered three x-rays of the left shoulder, two x-rays of the chest, and lab tests. The shoulder x-rays and lab results were unremarkable; however, the chest x-ray showed an enlargement of the main pulmonary artery. (Tr. 784-788, 790, 792).

On October 1, 2015, Plaintiff saw Dr. Lauter for joint pain, fatigue and general pain. (Tr. 515). Plaintiff reported her pain as a 2 out of 10. Dr. Lauter indicated that her symptoms appeared to be improving. *Id.* Dr. Lauter noted that Plaintiff had "multiple tender points as before." (Tr. 518).

**d.     Dr. Steve Stormsdorfer, PsyD**

In November 2015, Plaintiff met with Dr. Stormsdorfer to address depression and

anxiety. (Tr. 452-453). Dr. Stormsdorfer noted that Plaintiff's appearance was dysphoric and tearful, her affect was depressed and anxious, and her concentration was impaired. *Id.* Two weeks later, Plaintiff treated with Dr. Stormsdorfer. Plaintiff presented with a depressed affect, reported her depression as a 3 out of 10, and described feeling anxious. (Tr. 450). On December 2, 2015, Dr. Stormsdorfer provided a Statement of Health Care Provider/Diagnosis and Prognosis finding that Plaintiff suffered from depression, anxiety, and reduced focus and memory. (Tr. 751).

Plaintiff saw Dr. Stormsdorfer on December 12, 2015, and she had a depressed affect. On December 26, 2016, the notes reflected that Plaintiff had a depressed and anxious affect, that she reported feeling resigned, and that her depression and anxiety were a 4 out of 10. (Tr. 447). On February 26, 2016, Plaintiff appeared dysphoric, had a depressed and anxious affect, and reported that her depression and anxiety were a 5 out of 10. (Tr. 447). Similarly, at her March 2, 2016 appointment, Plaintiff appeared dysphoric and had a depressed affect. (Tr. 466). She also reported low energy, motivation, and poor focus. *Id.* She rated her depression and anxiety as a 6 out of 10. Plaintiff's March 9, 2016 appointment with Dr. Stormsdorfer revealed that she appeared dysphoric with a depressed affect. (Tr. 445).

Dr. Stormsdorfer's March 5, 2016 assessment of Plaintiff's restrictions and limitations noted moderate limitations in several mental capacities. (Tr. 718). Plaintiff had moderate limitations in the following areas: (1) ability to relate to other people beyond giving and receiving instructions, (2) ability to complete and follow instructions, (3) ability to perform simple and repetitive tasks, and (4) ability to perform complex and

varied tasks.

### e.   Dr. Davis Sewall

On October 13, 2017, Dr. Sewall administered an echocardiogram to help identify any issues with Plaintiff's enlarged main pulmonary artery. (Tr. 492). The echocardiogram revealed mild issues. (Tr. 493).

### f.   Dr. Kimberly Carroll

In October 2016, Plaintiff began seeing rheumatologist Dr. Kimberly Carroll. Plaintiff stated that she felt that her Cymbalta was helping her muscle aches, but that her fibromyalgia flares were unpredictable "like a roller coaster." (Tr. 511). She further stated that she would have one good day, followed by several bad days with lots of fatigue and achiness. *Id*.

On February 10, 2017, Plaintiff stated that she was doing about the same and that she had some good days and some bad days. (Tr. 508).

On March 16, 2018, Plaintiff met with Dr. Carroll regarding her fibromyalgia. (Tr. 826). Dr. Carroll's physical examination of Plaintiff revealed positive results for the left Tinel sign and positive for fibromyalgia tender points. (Tr. 826).

On April 29, 2018, Dr. Carroll completed a medical source statement. (Tr. 601). Dr. Carroll opined that Plaintiff was unable to perform even sedentary work. (Tr. 601-603). She found that Plaintiff could occasionally lift 10 pounds, could never lift 20 pounds, could occasionally twist or stoop, could rarely balance or crouch, and could never climb or crawl. (Tr. 602). She also found that Plaintiff could sit or stand less than two hours in an eight-hour workday, respectively; Plaintiff would also be off task 20% of the time in a

work setting and would have three bad days a month. (Tr. 602-603).

On December 14, 2018, Plaintiff reported hand numbness and weakness, elbow pain, and tenderness. (Tr. 820, 822-823). Loreana Nelson, NP, noted that Plaintiff reported that the numbness caused her to drop things including gallons of milk and dishes. (Tr. 820). NP Nelson's physical exam reflected tenderness in the left and right forearms and noted "positive" for fibromyalgia points. (Tr. 823). NP Nelson referred Plaintiff for electromyography to measure the muscle response to electrical activity in her fingers. The results showed no abnormalities. (Tr. 808).

On April 19, 2019, Plaintiff stated that her fibromyalgia felt "about the same." (Tr. 814). She stated that she experienced crawling skin and balance issues. (Tr. 814). She further reported that the aches in her elbows were so intense at times that she had difficulty steering her car. *Id.* Dr. Carroll ordered an MRI of Plaintiff's elbow which found no abnormalities. (Tr. 1048).

On October 18, 2019, Plaintiff returned to Dr. Carroll. (Tr. 1073). She again reported that she felt "about the same." Dr. Carroll noted that Plaintiff's sleep was still impaired and that upon physical examination, Plaintiff was globally tender. (Tr. 1076).

### g.    Dr. Mounir Shenouda

In August 2018, Plaintiff hired a new primary care physician, Dr. Shenouda. (Tr. 889). At this time, Plaintiff reported chest pain. Dr. Shenouda ordered a chest x-ray and referred Plaintiff to a cardiologist[3]; the x-ray revealed no acute cardiopulmonary findings.

---

[3]       Plaintiff met with cardiologist Dr. Norbert Urbanksi on September 6, 2018. Initial diagnostic testing did not reveal any abnormalities. Dr. Urbanksi ordered an echocardiogram and instructed Plaintiff to take an aspirin daily. Plaintiff's echocardiogram revealed no abnormalities. (Tr. 681, 683, 686).

Dr. Shenouda additionally ordered a thyroid ultrasound due to the reported fatigue. (Tr. 893, 914). The ultrasound found borderline thyroid size, as well as small indeterminate hypoechoic nodules bilaterally. (Tr. 914). On August 10, 2018, Plaintiff completed an internal medication health history questionnaire wherein she reported fatigue, arm pain, chest pain, back pain, joint pain, muscle aches, dizziness, migraines, numbness, restless legs, anxiety, stress, depression, sleep problems, and sleep apnea. (Tr. 906).

**h.   State Agency Consultants' Opinions**

On May 1, 2018, and on August 13, 2018, two state agency consultants assessed Plaintiff's RFC based on a review of the record. Dr. Lenore Gonzalez opined that Plaintiff could perform work at the medium exertional level and that Plaintiff was not disabled pursuant to the Medical-Vocational Guidelines. (Tr. 184, 193-194) On reconsideration, Dr. Young-Ja Kim, concluded that "[t]here was no additional evidence received that would alter previous determination." (Tr. 196, 206).

## ANALYSIS

The Court agrees that the ALJ did not adequately explain his assessment of Plaintiff's fibromyalgia and ignored or misinterpreted relevant evidence. Based on the foregoing, the Court finds that remand is required for a proper evaluation of the Plaintiff's subjective symptoms.

Fibromyalgia is "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features . . . . Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or

severity of fibromyalgia." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The principal symptoms of fibromyalgia are "pain all over," fatigue, disturbed sleep, stiffness, and multiple tender points. *Id.* The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment. *See Vanprooyen v. Berryhill*, 864 F.3d 567, 568 (7th Cir. 2017).

The ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . [and thus, the] court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–311 (7th Cir. 2012)(quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–505 (7th Cir. 2004)). But when the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). When making the credibility determination, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016) (superseding SSR 96-7p).[4] Additionally, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, reversal and remand is required where the ALJ "provides nothing more than a superficial analysis[.]"

---

[4]      SSR 96-7p referred to a claimant's "credibility," but SSR 16-3p removed that term in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at * 1 (March 16, 2016). Instead, ALJs are reminded to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that an individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," as consistent with the regulations. *Id.* Under either SSR version, the outcome of this case would be the same.

*Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). As such, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. Rather, the ALJ must "give[] specific reasons for [a credibility] finding, supported by substantial evidence." *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009).

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. *See* 20 C.F.R. § 404.1529(a)-(b). Second, after the claimant satisfies the first step, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *See* 20 C.F.R. § 404.1529(c). In evaluating allegations of pain, adjudicators are directed to consider whether the symptoms are "consistent with the objective medical [evidence] and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). *See also* 20 C.F.R. § 404.1529(a)(explaining that the agency considers both "objective medical evidence and other evidence" in evaluating whether an impairment affects activities of daily living and the ability to work).

Objective medical evidence is merely one factor to be considered, and an ALJ is not free to "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2016 WL 1119029, at *5 (Mar. 16, 2016). Other factors that the ALJ should look at

include "daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)(quoting 20 C.F.R. § 404.1529(c)(2)-(4)).

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that Plaintiff's statements regarding "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 29). Additionally, the ALJ noted that "the physical and mental capabilities required in performing many of the household tasks and social interactions the claimant described essentially replicate those necessary for obtaining and maintaining employment." *Id.* Specifically, the ALJ found inconsistency stating: "the medical evidence shows mild to moderate findings that do not support the claimant's allegations of debilitating symptoms and limitations." *Id.*

The Seventh Circuit has criticized decisions which do not examine the "critical difference" between activities of daily living and the demands placed on activities in a full-time job. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Without acknowledging such differences, the ALJ is "not entitled to use [the plaintiff's] successful performance of life activities as a basis to determine that [the plaintiff's] claims of a disabling condition [are] not credible." *Ghiselli v. Colvin*, 837 F.3d 771, 777-778 (7th Cir. 2016).

The Court finds that that ALJ erred when he determined that Plaintiff's daily activities were inconsistent with her allegations of pain/symptoms without considering the full context of that evidence. As for the ALJ's findings regarding daily activities, the

Court finds that the activities listed by the ALJ do not demonstrate that Plaintiff was able to function and work a full-time job. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)(observing that "[w]e have repeatedly cautioned that a person's ability to perform daily activities, especially if it can be done only with significant limitations, does not necessarily translate to an ability to work full-time."). In fact, the record contains evidence demonstrating the opposite. The record contains many limitations on how Plaintiff performed her daily activities. For example, Plaintiff, reported that she spends most of the day in bed. (Tr. 342). Plaintiff did report being able to dress herself, bathe, care for her hair, and shave; she could also perform the household chores of folding towels, watering plants, and doing basic cleaning. (Tr. 343). However, Plaintiff clarified that she needed "a lot of breaks" and help from her family to complete the chores. *Id.* Between naps, Plaintiff would read and watch tv. (Tr. 345). Further, the record reveals that Plaintiff did not shop alone because of falls, confusion, and fatigue. (Tr. 344). She also did not pay bills because she forgot to pay them in a timely manner and received late fees. *Id.* The ALJ's discussion did not examine the portions of the record which demonstrated that Plaintiff took many breaks, napped multiple times a day, and needed assistance during the day due to her symptoms. Further, there is no evidence in the record of malingering or symptoms of magnification. In fact, the record reflects numerous doctors and specialists who physically examined Plaintiff that noted her complaints and symptoms. (Tr. 460-461, 464, 468, 471, 489-490, 483, 508, 511, 515, 519, 581, 601-603, 677, 814, 820-823, 826, 957, 962, 966, 1073). Thus, the ALJ's reliance on daily activities was therefore improper because he failed to consider the numerous limitations on such activities. *See, e.g., Moss v. Astrue*, 555

F.3d 556, 562 (7th Cir. 2009)(noting that "an ALJ cannot disregard a claimants limitations in performing household activities") (citations omitted); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008)(stating that "[t]he ALJ ignored [the plaintiff's] qualifications as to how he carried out those activities . . . Each activity left him exhausted.") (emphasis in original). As such, the Court finds that the ALJ erred in the manner in which he considered Plaintiff's subjective factors.

The ALJ's error requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).

This Memorandum & Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATE: June 9, 2022.**

Digitally signed by Judge
Sison 2
Date: 2022.06.09 13:09:15
-05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**